**In the Matter of Miriam WILLIS, Debtor.**

**Miriam WILLIS, Plaintiff,**

v.

**PARKS CHEVROLET, INC., Defendant.**

**Bankruptcy No. B–83–00461 C–13.
Adv. No. A–83–0261.**

United States Bankruptcy Court, M.D. North Carolina.

Oct. 7, 1983.

Jane Wettach, Winston-Salem, N.C., for plaintiff.

Jack Van Zandt, III, Winston-Salem, N.C., for defendant.

## MEMORANDUM OPINION

RUFUS W. REYNOLDS, Bankruptcy Judge.

On March 21, 1983, a voluntary petition in bankruptcy was filed by Miriam Willis, hereinafter referred to as Debtor, requesting relief under Chapter 13 of the Bankruptcy Code. An order confirming the plan under Chapter 13 was entered June 8, 1983, by the Bankruptcy Court. Following confirmation of the Chapter 13 plan, the Debtor, on April 14, 1983, filed a motion requesting turnover of her car by Parks Chevrolet, Inc., hereinafter called Parks, to her pursuant to § 542 of the Bankruptcy Code and further requesting that Parks show cause as to why it should not be held in contempt for violation of the automatic stay provision of the Bankruptcy Code. In addition to the above motion and request for show cause, the Debtor filed a complaint asking for damages suffered as a result of Parks' disposing of her car. The initial hearing on this matter was held June 21, 1983, however, judgment was reserved and a full evidentary hearing on all the matters was held August 11, 1983.

At the hearing it was revealed that on March 6, 1981, the Debtor entered an installment sales contract with Parks for the purchase of a 1980 Chevrolet Monza, cash price of $4,995.00. Parks took a security interest in the automobile, and then assigned its contract rights to General Motors Acceptance Corporation (GMAC). On October 14, 1982, a 1981 Chevette was substituted for the Monza which had been involved in an automobile collision and totalled, but no other terms of the contract were altered. Subsequently, the Debtor defaulted on her contract in October, 1982. When the Debtor later took her car in for repairs necessitated by another automobile collision in December, 1982, Parks repossessed the Che-

vette as it stood on the premises in the body shop of Parks Chevrolet, Inc. The Debtor was notified of the repossession and given a deadline of December 13, 1982 to cure her default. Debtor was unable to cure her default by that date and GMAC reassigned its contract rights to Parks.

During the months following December, 1982, the Debtor frequently contacted the manager of the finance department of Parks Chevrolet, Inc. by telephone and through visits and discussed with the manager reacquisition of the Chevette. During this contact the Debtor was first told that she could not reacquire the car until she had cured the default and paid for the repairs. Debtor asked how much she would have to pay at which time the finance manager recited the amount necessary to reacquire the car. By the time the Debtor had this amount and went to Parks with the sum of money to pay for reacquiring the car, Parks had added up further arrearages between the time of the Debtor's first contact and the time Debtor had returned with the requested amount. When presented with the money, Parks refused to accept stating additional arrearages were due. Again and again the Debtor returned with the requested amount as stated to her by Parks only to find out that a higher amount was requested. The Debtor is a wage earner of low income, a single parent with several children to support and thus was unable to purchase another car in order to have transportation to work. As a result, the Debtor was forced to take the bus and walk to work to a second shift job which began at 11:30 p.m. Finally, unable to accumulate the funds necessary to meet the amount in arrearages, the Debtor sought the assistance of counsel in late February or early March.

On Thursday, March 17, 1983, the Debtor's attorney contacted the manager of the finance department of Parks, and notified him that the Debtor was planning to file a Chapter 13 petition. The petition was filed at 8:00 a.m. on Monday, March 21, 1983. The finance manager was again contacted by the Debtor's attorney on Monday morning and notified that the Chapter 13 petition had been filed. Meanwhile, although the car had been for sale on Parks' lot since the December repairs had been made, on Saturday, March 19, 1983, the day after Parks had been told that the Chapter 13 petition was to be filed the following Monday, Parks accepted a $100.00 deposit for the car. Parks later stated at the August 11, 1983 hearing that the $100.00 deposit was sufficient to show that the sale had been completed before filing. On Monday afternoon, the customer, according to Parks, returned and paid in cash the remainder of the purchase price for the car. A bill of sale was executed that same day and the car was delivered to the customer.

Upon learning of these events, the Debtor filed a motion requesting turnover of the property pursuant to § 542 of the Bankruptcy Code and that Parks show cause as to why it should not be held in contempt for violating the automatic stay provisions of the Code. The Debtor further filed a complaint requesting damages as a result of the defendant's actions in the sale of the Chevette. Parks counterclaimed for a deficiency resulting from the sale of the automobile.

The filing of a bankruptcy petition operates as an automatic stay, applicable to all entities, of "(4) any act to create, perfect or enforce any lien against property of the estate." 11 U.S.C. § 362. The initial inquiry necessary to determine whether the defendant violated the stay is whether the car was the property of the estate, then it must be determined whether the sale and delivery of the car were acts to enforce a lien against that property.

█ Property of the estate is defined in 11 U.S.C. § 541(a)(1) as "all legal and equitable interests of the debtor in property as of the commencement of the case." As was explained in a recent opinion of the United States Supreme Court, Congress intended a broad range of property to be included in the estate, and the debtor's lack of a possessory interest in the property at the time of the filing of the petition does not exclude it from this section. *United States v. Whiting*

Pools, Inc., —— U.S. ——, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983). At the time of the filing, the Debtor retained legal title to the car and the equitable rights to cure the default, redeem the vehicle, receive an accounting and receive any surplus. Since foreclosure under the security interest had not been completed at the time of the Chapter 13 petition filing, the Debtor held both legal and equitable interests in the car and it was property of the estate at the moment the petition was filed. The car, therefore, would be subject to the automatic stay provision. See, *In re King,* 14 B.R. 316, 7 BCD 530 (Bkrtcy.M.D.Tenn.1981).

■ The second question is whether the sale of the car on Monday was an act to enforce the lien. As the legislative history of 11 U.S.C. § 362 indicates, the automatic stay is designed to stop "all collection efforts, all harassment, and all foreclosure actions." Actions affected by the stay include judicial and private foreclosures and self-help remedies against collateral. 2 *Collier on Bankruptcy,* § 362.04. The acceptance of the purchase price, the delivery of the car, and the counterclaim filed in this action for a deficiency were all part of the process begun by the repossession of the car designed to enforce the creditor's lien after the Debtor's default. The Court holds that the actions of the defendant constituted a violation of the automatic stay. The Court also finds that the violation of the stay was knowing and intentional. The evidence shows that the defendant was contacted by the Debtor's attorney and notified of the pending Chapter 13 petition *twice* before the car was sold and delivered to the third party. The employee who spoke to the Debtor's attorney, the manager of the finance department, testified that he was familiar with Chapter 13 proceedings and aware of the meaning of the automatic stay provision. In addition, he testified that after receiving the information concerning the filing from the Debtor's attorney, he did nothing to prevent the sale of the car, nor were any attempts made to retrieve the car after it was sold.

Having determined that the defendant committed a willful violation of the automatic stay, the Court faced the issue of how to compensate the Debtor for the damages she suffered. The Debtor argued that the car should be recovered and turned over to her or that she should receive compensation for permanent loss of the vehicle. In addition, she argued that she was entitled to damages for her loss of use of the vehicle from the date of the petition through the time of the trial, calculated in terms of the fair market rental value for a similar car during that period, punitive damages, costs, and attorney's fees. The Debtor testified at the August 11, 1983 hearing that she had called several rental agencies and that she was quoted a figure of $200.00 per week as the necessary amount to rent a similar car. Figuring that she had lost the use of the car from March through the August 11, 1983 hearing for a total of 21 weeks, the Debtor computed a comparable rental value of a similar car would be $4,200.00. The Debtor further requested $3,000.00 in punitive damages plus costs and attorney's fees which computed at 38 hours of service through court time at a rate of $60.00 an hour would equal a total attorney fee request of $988.00. Therefore, Debtor requested damages of $8,188.00 plus costs of court.

■ The Court finds that there is no evidence that the vehicle could be recovered whether the sale at the time involved a bona fide third party purchaser or an in-house transaction, therefore, the Court deems it would not be appropriate to order recovery of the property. The Court also declines to award damages based on the calculation of loss of use of the vehicle and replacement value of such vehicle in the amount of $8,188.00 plus court costs.

The Court does find, however, that the Debtor suffered damages as the result of the unlawful action of the defendant. Had the defendant not sold the car, it would be subject to turnover under 11 U.S.C. § 542 and the principal enunciated in *United States v. Whiting Pools, supra.* Thus, the Debtor has lost continuing use of the car

and was deprived of her equity in it. In addition, her expectations that upon the filing of the petition she would regain the use of her car and be able to pay the remaining debt under the protection of the Bankruptcy Court, and then own her car free of lien, were defeated. The Debtor must now save enough money to make a down-payment on another car, a considerable struggle for a low-income person such as the plaintiff.

The Code does not specify the penalty for violation of the automatic stay. This Court is interested in finding a measure of damages that will fairly compensate the Debtor for both the tangible and intangible loss that she suffered. Awarding her only her current equity in the car, calculated by subtracting the payoff amount from the fair market value, would be completely inadequate in this case and amount to only $13.00. On the other hand, awarding the fair market value of the car plus rental value from the day of the violation to the day of trial, approximately $8,188.00, seems excessive. The Court notes that drafters of the Uniform Commercial Code were faced with a very similar problem in Article 9. Article 9 of the Code sets out the procedures which must be followed by creditors who wish to enforce their liens upon default by consumers. The Article includes provisions regarding how a repossession may occur, what notice is required, and how the sale must be conducted. The drafters needed to find a measure which would appropriately compensate consumers when creditors failed to follow the Code provisions and repossessed property wrongfully. The formula devised by the Code drafters is "an amount not less than 10% of the cash price plus the time price differential." UCC § 507. Being tied both to the purchase price of the secured property and the finance charge, this formula keeps the amount in line with the value of the property and the installment contract between the parties.

The Court finds this damage formula to be an appropriate model to follow in this case. The Debtor here is in an analogous position with the consumer whose secured property has been disposed of by a creditor in violation of the UCC. This formula will allow the Court to award the Debtor a sum in keeping with the value of the property, the contract between the parties, and the losses the Debtor suffered. Figures needed to calculate the amount are found in Exhibit A, the installment sale contract which was entered into evidence by stipulation of parties. Using these figures, it can be determined that the cash price of the car was $4,995.00. Ten percent of the cash price is $449.50. The Court will then add $499.50 to the amount of finance charge of the car which is $1,515.71 (time price differential according to the formula) and find that the Debtor is entitled to $2,015.21 plus costs (to be taxed by the Clerk of the Bankruptcy Court) from the defendant Parks Chevrolet, Inc.

The Court also finds that the plaintiff is entitled to recover attorney's fees from the defendant. The amount of attorney's fees to be charged against the defendant will be determined when the order in this matter becomes final.

The Court further finds that the defendant's counterclaim for a deficiency is without merit and is not allowed.

Let the order be entered accordingly.